IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| KEVIN J. GUZMAN DE JESUS, | CASE NO. 1:22-cv-00774 |
| Plaintiff, | DISTRICT JUDGE BENITA Y. PEARSON |
| vs. | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Kevin J. Guzman de Jesus[1] filed a complaint against the Commissioner of Social Security seeking judicial review of the decision denying him disability insurance benefits and supplemental security income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In February 2020, Guzman filed an application for supplemental security income and disability insurance benefits, alleging a disability onset

---

[1]    Since Petitioner refers to his last name as Guzman throughout his papers, I have continued to do so here.

date of December 2, 2019,[2] and claiming that he was disabled due to schizophrenia, depression, and psychosis.[3] Tr. 100. The Commissioner denied Guzman's applications at the initial level and upon reconsideration. Tr. 133, 138, 143, 148. Guzman requested a hearing before an Administrative Law Judge (ALJ). Tr. 156–57.

In December 2020, ALJ Jessica Hodgson held a hearing at which Guzman and vocational expert Melanie Frye testified. Tr. 39–65. In February 2021, ALJ Hodgson issued a written decision finding that Guzman was not disabled. Tr. 19–33. In March 2022, the ALJ's decision became final when the Appeals Council declined further review. Tr. 1–3, *see* 20 C.F.R. § 404.981.

---

[2] "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

[3] Guzman also alleged that he was disabled due to attention deficit hyperactivity disorder (ADHD) and manic bipolar disorder. Tr. 100. There is no indication, however, that either of these conditions severely impaired Guzman during the relevant period of time—December 2, 2019 through November 1, 2022. Tr. 25. The ALJ made this finding based on objective medical evidence including a mental health assessment of Guzman that social worker Bethany Bock conducted on November 22, 2019—just 10 days before Guzman's alleged onset date. Tr. 725–30. Guzman did not include ADHD or manic bipolar disorder when he listed his conditions for Bock, and specifically denied experiencing mania. Tr. 725–26. Although Guzman opined that he believed he had ADHD and described taking "street Adderall," Bock declined to include ADHD as one of Guzman's diagnoses and did not provide any counseling or treatment for ADHD. Tr. 729. Guzman did not otherwise provide any evidence of an ADHD diagnosis or treatment within the relevant time period. While Guzman mentions a short attention span, lack of focus, and difficulty concentrating, he does not take issue with the ALJ's assessment of his ADHD or manic bipolar disorder. Doc. 9, at 20–21. Guzman has thus forfeited any claim as to those conditions and I will not devote additional discussion to them.

Guzman filed this action in May 2022 and raises the following assignments of error:

1. The ALJ erred when she failed to provide a justifiable rationale for finding that the opinion of the treating source was not persuasive.

2. The ALJ erred when she failed to find that the waxing and waning and variability of Guzman's symptoms would preclude him from engaging in substantial gainful activity on a full-time and sustained basis.

3. The ALJ erred in her evaluation of Guzman's symptoms when she failed to properly analyze the limitations stated by Guzman and his mother as required by Social Security Ruling 16-3p.

Doc. 1; Doc. 9, at 1.

## Factual background

*1. Personal and vocational evidence*

Guzman was born in August 1995 and was 24 years old on the onset date of his alleged disability. Tr. 31, 98. He has a high school education and no meaningful prior work experience. Tr. 106, 225, 250.

*2. Medical evidence*[4]

From November 2019 through April 2020, Guzman attended regular behavioral therapy, psychological counseling, and psychiatric medication

---

[4]    The recitation of medical evidence here is limited to relevant facts provided by the parties and is not intended to be exhaustive. Guzman's claim is based exclusively on mental health so I have limited the factual discussion accordingly.

3

management at MetroHealth. Tr. 725–65. Licensed clinical social worker Bethany Bock conducted a mental health assessment of Guzman in November 2019. Tr. 725–30. Guzman told Bock that he suffered from depression, anxiety, insomnia, and schizophrenia. Tr. 725. He reported that, since age 15, he had experienced a high level of stress, had difficulty sleeping, and suffered from auditory and visual hallucinations. *Id.* Bock listed his means of financial support as "employment." Tr. 727. She found that Guzman had a depressed and anxious mood with cooperative, restless, and anxious behavior, sustained concentration, and that his affect was "congruent," his rate and flow of speech were clear and normal, his thought process was logical and organized, his thought content that was congruent with reality, his cognition was within normal limits, his insight was fair and his judgment was questionable. Tr. 728.

Bock observed Guzman to be adequately groomed and oriented to time, person, and place. *Id.* She listed Guzman's education level ("some college") as one of his strengths and capabilities, Tr. 727, 728, and indicated that with respect to his learning needs, he needed coping skills. *Id.* Bock diagnosed Guzman as having early onset persistent depressive disorder with mood congruent and psychotic features, and recommended individual therapy as well as psychiatric treatment. Tr. 729. Bock scheduled Guzman for psychotherapy with licensed social worker Jane Martinez and for psychiatric medication management with advanced practice certified nurse practitioner Lilia Pron. *Id.*

4

In January 2020, Guzman had an appointment with Nurse Pron for pharmacologic management. Tr. 674–77, 733–42. He indicated that he was not taking any medication at the time. Tr. 733. Guzman's chief complaints were anxiety, a depressed mood, auditory and visual hallucinations, paranoia, occasional suicidal ideation, and poor sleep. Tr. 733. He said that he smoked marijuana "almost every day" and had hallucinations about three times per week. *Id*. He reported three previous psychiatric hospitalizations: first, when he attempted suicide at 15 years old; second, when he was "hallucinating" and "really crazy;" and third, when he was hearing things and having paranoid thoughts. *Id*.

Pron found that Guzman had a euthymic mood,[5] a "full" affect, and good hygiene. Tr. 737. She observed that Guzman was well-groomed, well-nourished, and oriented to time, person, and place. *Id*. Pron noted that Guzman's speech was normal, his thought process was logical and organized, his attention and concentration were "sustained," his insight and judgment were good, and his memory was "within normal limits." *Id*. She found that there was no evidence of paranoia, delusions, or other perceptual disturbance. *Id*. Pron prescribed Guzman Atarax for anxiety and Zyprexa for psychosis, and established his diagnosis as paranoid schizophrenia. Tr. 238, 675.

---

[5]     Euthymia is a term in psychiatry to describe the state of living without mood disturbances. *Euthymia and Bipolar Disorder*, Healthline (last visited Feb. 2, 2023), https://www.healthline.com/health/euthymic. A euthymic person has a calm and steady mood, and typically experiences feelings of cheerfulness and tranquility with an increased resilience to stress. *Id*.

In March 2020, Guzman saw Nurse Pron for pharmacologic management. Tr. 745–52. Guzman indicated that the Zyprexa caused him to gain weight but reported no additional significant changes or updates. Tr. 746. He advised Nurse Pron that his mother had recently traveled to Puerto Rico for work and that he expected her to return in "April or June." *Id*. He reported an increase in anxiety, paranoia, and visual hallucinations and attributed these symptoms to missing his mother; he also referred to his concentration as "terrible." *Id*.

Nurse Pron found that Guzman's mood was anxious, his affect was "range full," and his hygiene was good. *Id*. She observed that he was well-groomed, well-nourished, and oriented to time, person, and place, with cooperative and appropriate behavior that did not indicate any acute distress. *Id*. She noted that Guzman's speech was spontaneous and normal in rate and flow, his thought process was logical and organized, his thought content contained no evidence of delusions, his attention and concentration were "sustained," his insight and judgment were good, his memory was "within normal limits," and his perception included visual hallucinations. *Id*. She noted that, "by chart review and presentation," Guzman met the criteria for paranoid schizophrenia and added generalized anxiety disorder as another diagnosis. Tr. 749. Nurse Pron prescribed Guzman Risperdal, an alternative antipsychotic, and discontinued his use of Zyprexa. *Id*.

6

A few weeks later in March 2020, Guzman attended a behavioral counseling appointment via teleconference with Counselor Martinez. Tr. 755–9. Martinez noted that Guzman was cooperative and oriented, and that his thought process was logical, his insight and judgment fair, his memory and concentration normal, his mood euthymic, and his affect "full." Tr. 756. Guzman denied feeling symptoms of depression over the previous two weeks but reported "episodes" during which he experienced an acute loss of reality despite taking his medication. *Id.*

In April 2020, Guzman attended another behavioral counseling appointment via teleconference with Counselor Martinez. Tr. 760–4. Martinez observed Guzman's behavior to be cooperative and noted that he was oriented to time, person, and place. Tr. 761. She found his speech to be spontaneous with a normal rate and flow, his thought process logical and organized, his association "tight," his judgment and insight fair, his memory within normal limits, his attention span and concentration sustained, his language appropriate, his fund of knowledge "okay," his affect "range full," and his mood euthymic. Tr. 761. Martinez noted Guzman's report of auditory and visual hallucinations three to four times per week but did not observe him having any hallucinations during their session. *Id*. Guzman denied any symptoms of depression over the previous two weeks. *Id*. Martinez noted that Guzman had no barriers to learning and that his symptoms were unchanged. *Id*.

In June 2020, Guzman saw Nurse Pron twice for pharmacologic management and psychotherapy. Tr. 793–803, 805–15. During the earlier June appointment, Guzman said,

> [t]he voices are getting worse. My mom is still in Puerto Rico. … I saw a dead man playing on my computer. I lost it. I started to scream. … I feel slower when I take Risperdal. My anxiety is more intense. I smoke weed maybe twice a month. … I still don't sleep. I can [shut] down during the day and sleep for several hours. … I don't want to go to the hospital. But if I feel worse, I will.

Tr. 806. Pron found Guzman to have good hygiene and noted that he was oriented to time, person, and place, adequately groomed, well-nourished, and displaying cooperative and appropriate behavior. *Id*. She observed his speech to be spontaneous with a normal rate and flow, his thought process logical and organized, his mood anxious, his affect "range full," his attention and concentration sustained, his memory within normal limits, and his judgment and insight good. Tr. 806. Proin noted that although Guzman's thought content contained no evidence of delusions, his perception did include visual hallucinations. Tr. 807.

During Guzman's later June appointment with Nurse Pron, he reported severe mood swings and a "scary" psychotic episode during which he saw people who weren't there. Tr. 794. Pron found that Guzman's mood was anxious, his speech was spontaneous with a normal rate and flow, his thought process was logical and organized, that he had no evidence of delusions or paranoid thoughts, and that he was oriented to time, person, and place. *Id*. She

described Guzman's attention and concentration as sustained, his memory as within normal limits, and his judgment and insight as good. Pron continued his medications without adjustment. *Id*.

    3.    *Function Reports*

In May 2020, Guzman completed a function report. Tr. 210–17. This self-reported questionnaire asked Guzman to explain how his impairments limited his ability to work. Tr. 210. Guzman wrote that he suffered from schizophrenia and experienced "psychotic breaks" that made it difficult for him to "identify what is real." *Id*. The report asked Guzman to describe what he did between waking up and going to bed. Tr. 211. Guzman wrote, "Play video games and help mom." *Id*.  He claimed that he needed his mother to remind him to take care of his personal needs, grooming, and medication. Tr. 212.

The report asked Guzman about his abilities. Tr. 214. He indicated that he required "special instructions and guidance to complete tasks." *Id*. He claimed that his impairments affected his memory as well as his ability to concentrate, understand, follow instructions, and get along with others. *Id*. He said that he could walk for one hour before needing to stop and rest, and could resume walking again after approximately 10 minutes. *Id*. He indicated that when he was depressed, he found it difficult to focus and thus did not communicate properly. *Id*. He claimed that his inability to focus resulted in his being "let go" from "odd jobs" because he did not finish assigned tasks. Tr. 217.

In September 2020, Guzman's mother completed a third-party function report. Tr. 249–56. She reported that her son had been "let go" from "jobs" after having psychotic episodes in the workplace, including one that led to his immediate hospitalization on psychiatric grounds. Tr. 249. Guzman's mother said that Guzman became distracted easily, needed individual attention, and had difficulty working independently. *Id.* She indicated that he needed a reminder to bathe, shave, and wash his hair, and would wear the same clothing for days. *Id.* Guzman's mother claimed that while he could prepare simple meals for himself, he would skip meals if he wasn't fed. Tr. 250. She said that "sometimes" her son urinated on himself when he was scared. *Id.* Guzman's mother described his mental condition as "unpredictable" and marked by "good and bad days." Tr. 249.

### 4. *State agency and other medical opinion evidence*[6]

In May 2020, state agency psychologist Leslie Rudy, Ph.D., reviewed the evidence and found that Guzman's statements about his symptoms were partially consistent with the medical and non-medical evidence, when

---

[6]    When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

considering the totality of the record. Tr. 112. Dr. Rudy found that Guzman's statements regarding the intensity, persistence, and functionally limiting effects of his symptoms were not substantiated by the objective medical evidence alone. *Id.* Pertinently, Dr. Rudy noted:

> Mentally, [Guzman] reports he has a very short [attention] span and difficulty concentrating. He reports he suffers from psychotic breaks which result in not being able to identify what is real. He notes that his ability to get along with others is limited yet he gets along fine with authority. He reports that he needs special instructions and guidance to complete tasks. The [medical-evidence record] shows that his [attention and concentration] and memory (recent and remote) are all intact. He is always cooperative at psych follow ups. He has no history of interpersonal conflicts. While he states that he needs special instructions to complete tasks, he has been living alone/independently since his mother moved back to Puerto Rico and he is managing his [appointments], [medications], meals[,] etc[.,] independently. [H]e reports that he has psychotic breaks, however, there has been [an inpatient hospitalization] since [February 2018] which was substance-induced. [O]verall, statements are considered to be partially consistent.

Tr. 104.

Dr. Rudy found that Guzman had the mental Residual Functional Capacity (RFC)[7] to complete unskilled work with non-exertional limitations only, and to complete tasks that have one to four routine steps and are not fast-

---

[7]     An RFC is an "assessment of" a claimant's ability to work, taking his or his "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

paced. Tr. 105. Dr. Rudy opined that Guzman was moderately limited in his

ability to:

- carry out detailed instructions;
- maintain attention and concentration for extended periods;
- work in coordination with or in proximity to others without being distracted by them;
- complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- interact appropriately with the general public;
- accept instructions and respond appropriately to supervisor criticism;
- get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and
- respond appropriately to changes in the work setting.

Tr. 105. Dr. Rudy further opined that Guzman was not significantly limited in

his ability to:

- carry out very short and simple instructions;
- perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- sustain an ordinary routine without special supervision;
- make simple work-related decisions;
- ask simple questions or request assistance;
- maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness;
- be aware of normal hazards and take appropriate precautions;
- travel to unfamiliar places or use public transportation; and
- set realistic goals or make plans independently of others.

Tr. 105–06.

In July 2020, upon reconsideration, state agency psychologist Robyn

Murry-Hoffman, Psy.D., affirmed Dr. Rudy's findings. Tr. 119–23.

During the period of initial consideration, state agency physician Lynne

Torello, M.D., reviewed the evidence, noting that Guzman alleged a disability

12

on mental health grounds only. Tr. 100–15. She found that Guzman had no physical limitations and that his "physical impairment was not severe." Tr. 104. Upon reconsideration, state agency physician Gerald Klyop, M.D., affirmed Dr. Torello's findings. Tr. 116–19. The reconsideration report describes Guzman's physical impairment evidence as consisting only of the surgical excision of a cyst without complications. Tr. 120.

In November 2020, Nurse Pron completed a Mental Health Questionnaire in which she listed Guzman's diagnosis as chronic paranoid schizophrenia and indicated that she had seen Guzman a total of seven times over ten months. Tr. 260. When the questionnaire asked Pron to describe clinical findings that demonstrated the severity of Guzman's mental impairment and symptoms, she wrote, "hallucinations, paranoia, anxiety, [and] poor sleep." *Id*. The questionnaire asked her to rate Guzman's ability to complete various work-related activities in 20 categories, on a five-part scale from "unlimited or very good" to "no useful ability to function." Tr. 260–61. Pron opined that there were no activities in which Guzman had "no useful ability to function," the lowest level, and no activities in which his abilities were "unlimited or very good," the highest level. *Id*. Instead, for 11 of the 20 categories, she rated him in the middle—"seriously limited, but not precluded"—for 5 she rated his as "limited but satisfactory," and for 4 she rated him as "unable to meet competitive standards." Tr. 260–61.

Pron was "not sure" how often Guzman's impairments or treatment would require him to be absent from work per week and "not sure" how much time they might cause him to spend off-task. Tr. 261.

5. *Testimonial evidence*

During the hearing in December 2020, Tr. 39–65, Guzman's attorney, Michael Liner, began the substantive portion of the hearing with an opening statement, Tr. 44–46. After Guzman was sworn in, the ALJ asked a few questions to establish that Guzman had not worked since his alleged disability onset date of December 2, 2019, then indicated that she had nothing further to ask. Tr. 46–47. Attorney Liner conducted questioning for the rest of Guzman's testimony. Tr. 47–58.

Guzman said that he had previously lived in Texas, and had moved to Cleveland to access better healthcare, specifically to address a "big stick" that he "had in [his] back." Tr. 48. Since his relocation, Guzman said that his mental health has been in significant decline. *Id*.

Guzman has "schizophrenia [] disorder and things" that cause him to lose touch with reality during episodes which occur three to four times per week. *Id*. During these episodes, Guzman might see "someone" who's "just not there" or think something is attacking him and that he has to "fight it out" by himself "if it screams." Tr. 48. Although his episodes have been getting worse, talking about them with his doctor and taking his medication helps. Tr. 49. Guzman takes his daily medications—Mirtazapine, Divalproex, Seroquel, and

Atarex—and never misses a dose because they prevent his symptoms from getting more intense. *Id*. Without medication, he believes that he would decompensate. *Id*. He testified that he still has "minor episodes with everything and the pills" and that "[the pills] don't help[] [him] focus or anything." *Id*.

Guzman said that his medication did not improve his condition; it just "[kept him] out," by which he meant asleep, or numb, for "almost half" of each day. Tr. 49–50. Depending on the day, however, Guzman is "sometimes" able to stay awake. Tr. 50. He said that his drowsiness is a side effect of one of his medications and that he had recently mentioned this to his doctor. Tr. 51. His doctor preferred to approach the issue by adding Atarex to his medications and waiting for two weeks in the hope that this added medication might alleviate the drowsiness without otherwise adjusting his medications. Tr. 51.

Attorney Liner asked Guzman to describe a typical day and Guzman responded that his daily activities depended on how his brain was working. Tr. 51. Sometimes, his condition "wreck[s] [him] all morning" because he wakes up to a panic attack. Tr. 50. Sometimes, his condition "kick[s]" and "last[s] for two [or] three hours." *Id*. Sometimes, he can listen to music, watch television, or do whatever he wants without any interference from his condition. *Id*.

Guzman said that he was generally reluctant to go outside and specifically did not do so without his mother. Tr. 51. He said that he feels unsafe when he leaves home and, as a result, doesn't run his own errands and

relies on his mother for nearly everything. Tr. 51–2. Guzman's mother is the only person that he trusts. Tr. 52. Guzman only feels safe with her and only she knows how to take care of him and his condition. *Id*. Guzman's mother pays for everything that he needs. *Id*. During the relevant time period, Guzman's mother traveled to Puerto Rico where she stayed for several months while he remained in Cleveland. *Id*. While she was gone, Guzman said that he didn't leave home except to retrieve some groceries that Walmart had delivered outside his apartment. Tr. 52.

Attorney Liner told Guzman to imagine a situation in which Walmart was not able to deliver his groceries and his mother was not available to help, and then asked how Guzman would handle being inside a store. Tr. 52–53. Guzman responded, "I'm not getting there. I'll go hungry." Tr. 53. Guzman was unable to recall the specific date on which he last left his apartment but he knew that it was when his mother was in town because he only leaves home with her. *Id*.

Guzman confirmed that in May 2020, while living in Texas, one of his cousins lived with him. Tr. 54. He claimed that since moving to Cleveland, he has only lived with his mother due to his condition. Tr. 54. He confirmed that during the relevant time period, he attended one of his virtual therapy appointments with Counselor Martinez while he was riding in a car with his cousin. *Id*.

16

Guzman discussed his interpersonal style as an employee. Tr. 55. He said that when he had been employed in the past and needed to interact with a supervisor or coworker, he did not usually speak. *Id*. He would try to do his own work and "not be in everyone's … stuff" because he "couldn't take it." *Id*.

Guzman discussed his paranoia and engaged in the following colloquy with Attorney Liner:

> Q  Okay. Do you feel paranoid even when you're at home?
>
> A  Yes, sir.
>
> Q  Can you kind of describe for us the paranoid feeling and talk us through that, what it feels like for you?
>
> A  I feel really unsafe. It all starts with high anxiety levels where it's I wake up with major anxiety. And it's like – how can I say it so you can like picture it in my eyes? The feeling is like if you were being punched in the gut like a lot of times and you're just watching this hey, do it [sic], but you can't do anything about it. You're trying but you're just not there. But you believe it's real. And it happens frequently and it comes to haunt you every week.

Tr. 55–56.

Guzman discussed his use of marijuana, which he said he had discontinued years ago when he was still living in Texas. Tr. 56. Attorney Liner directed Guzman's attention to records from October 2020 that described his mother forcing him to give up marijuana "a month ago," which would have been in September 2020. *Id*. Attorney Liner asked whether Guzman recalled using marijuana at that time and Guzman said that he did not. *Id*. Attorney Liner explained that the reason that he was asking these questions was to clarify

17

things for the ALJ, who would be carefully reviewing the records. *Id*. Guzman reaffirmed his testimony and asserted that he had not used marijuana in two years. Tr. 56.

Guzman said that he had difficulty learning new things. Tr. 57. He said that sometimes, it wasn't easy for him to understand things because his concentration wasn't good. *Id*. If there were a lot of instructions, he might understand just one of them or still do the task incorrectly because he didn't actually understand the instruction. *Id*. People need to repeat things "four to seven times" before he will grasp the concept or understand. *Id*.

After Guzman, vocational expert Melanie Frye testified. Tr. 58–65. After qualifying Frye as an expert, the ALJ asked Frye a series of hypothetical questions in which each successive hypothetical individual incorporated the limitations of the previous. Tr. 59–62. First, the ALJ asked whether a hypothetical individual the same age as Guzman with the same education level and lack of work history would be able to perform any work if he or she had Guzman's RFC, discussed below. Tr. 59. Frye confirmed that such an individual with Guzman's RFC could perform unskilled work with a medium level of exertion in representative positions such as hand packer, industrial cleaner, and salvage laborer. Tr. 59.

The ALJ added restrictions to the hypothetical, and Frye testified that such an individual could still perform the jobs that she had listed if the individual could never interact with the public and could only occasionally

interact with coworkers. Tr. 60. Frye testified that such an individual could still perform those jobs if the individual was further restricted to interaction with a supervisor only occasionally. Tr. 60–61. Frye indicated that the individual would be precluded from all work if he or she were never able to interact with coworkers, could interact only occasionally with a supervisor, and could never interact with the public. Tr. 61. Frye opined that under any of the previous hypotheticals, the individual would be precluded from all work if he or she needed to be off-task 20 percent or more of the workday or absent two or more days per month. *Id*. Frye affirmed that the basis of her testimony was primarily the Dictionary of Occupational Titles, or DOT, but for certain aspects of her testimony, such as her opinion as to the pace of the work or the social interaction required, she relied on her professional training and expertise. Tr. 60.

## The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

> 1.  Guzman meets the insured status requirements of the Social Security Act through June 30, 2021.
>
> 2.  Guzman has not engaged in substantial gainful activity since December 2, 2019, the alleged disability onset date. 20 CFR 404.1571 *et seq*., and 416.971 *et seq*.
>
> 3.  Guzman has the following severe impairments: persistent depressive disorder with mood congruent psychotic features, early onset; paranoid schizophrenia; and generalized anxiety disorder. 20 CFR 404.1520(c) and 416.920(c).

19

4. Guzman does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Section 404, Subpart P, Appendix 1. 20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926.

5. Guzman has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: Guzman can work at unprotected heights frequently, work around moving mechanical parts frequently, and operate a motor vehicle frequently. Guzman is able to perform simple, routine, and repetitive tasks, but not at a production rate pace (e.g. assembly line work); is able to make simple work-related decisions; is able to interact with coworkers and supervisors occasionally; and is never able to interact with the public.

6. Guzman has no past relevant work. 20 CFR 404.1565 and 416.965.

7. Guzman was born [in] … 1995 and was 24 years old, which is defined as a younger individual age 18– 49, on the alleged disability onset date. 20 CFR 404.1563 and 416.963.

8. Guzman has at least a high school education. 20 CFR 404.1564 and 416.964.

9. Transferability of job skills is not an issue because Guzman does not have past relevant work. 20 FFR 404.1568 and 416.968.

10. In consideration of Guzman's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Guzman can perform. 20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a).

11. Guzman has not been under a disability, as defined in the Social Security Act, from December 2,

2019, through the date of this decision. 20 CFR
404.1520(g) and 416.920(g).

Tr. 25–32.

### Standard for disability

Eligibility for benefit payments depends on the existence of a disability.

42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage

in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less

than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a

disability determination:

> 1. Is the claimant engaged in substantial gainful
> activity? If so, the claimant is not disabled.
>
> 2. Does the claimant have a medically determinable
> impairment, or a combination of impairments, that
> is "severe"? If not, the claimant is not disabled.
>
> 3. Does the claimant's impairment meet or equal one
> of the listed impairments and meet the duration
> requirement? If so, the claimant is disabled. If not,
> the ALJ proceeds to the next step.
>
> 4. What is the claimant's residual functional
> capacity, and can the claimant perform past relevant
> work? If so, the claimant is not disabled. If not, the
> ALJ proceeds to the next step.
>
> 5. Can the claimant do any other work considering
> the claimant's residual functional capacity, age,
> education, and work experience? If so, the claimant
> is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence

22

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

## Discussion

*Issue 1: The ALJ did not err in her evaluation of Nurse Pron's opinion.*

Guzman claims that the ALJ failed to set forth a complete rationale to support the finding that Nurse Pron's opinion was unpersuasive. Doc. 9, at 8–15. Guzman argues that the ALJ failed to properly assess Pron's medical opinions as required by 20 C.F.R. § 404.1520c, asserting that it is "unclear from the record" how the ALJ determined that Guzman could engage in substantial gainful activity on a full-time and sustained basis. Doc. 9, at 8. Guzman argues that the ALJ erred when she found Pron's opinions unpersuasive as unsupported by Pron's own treatment notes. Doc. 9, at 10. Guzman claims it was "harmful error" that the ALJ declined to incorporate Pron's findings into the RFC. Doc. 9, at 14.

As to the ALJ's treatment of Pron's opinions, the Commissioner is required to evaluate the persuasiveness of all medical opinions using the following factors: supportability; consistency; treatment relationship,

including the length, frequency, purpose, extent, and examining relationship; specialization; and other factors. 20 C.F.R. § 416.920c(a), (c)(1)–(5). *Supportability* and *consistency* are the most important factors. 20 C.F.R. § 416.920c(a). The Commissioner must explain the *supportability* and *consistency* factors when discussing a medical opinion. 20 C.F.R. § 416.920c(b)(2). The Commissioner is not required to discuss the remaining factors. *Id*. "A reviewing court evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Toennies v. Comm'r of Soc. Sec.*, 2020 WL 2841379, at *14 (N.D. Ohio June 1, 2020) (internal quotation marks and citation omitted).

Here, the ALJ provided a sufficient basis for her finding that Nurse Pron's opinion was not persuasive. Tr. 31. The ALJ considered the opinion as follows:

> In November 2020, the claimant's own medical source, Lilia Pron, APRN-CNP, opined that the claimant was either seriously limited, but not precluded or was unable to meet competitive standards for most mental work abilities, and was limited but satisfactory for some mental work abilities. (Ex. 12E) This opinion is not persuasive. Nurse Pron is the claimant's medication management provider. However, the opinion is not entirely supported by the provider's own treatment notes showing exam findings such as logical and organized thought processes, normal memory and concentration, full orientation, well-groomed appearance, and cooperative calm behavior or consistent with similar exam findings from other providers. For example, Nurse Pron notes ["]unable to meet competitive standards["] for ["]maintaining attention and concentration,["] but exam findings

24

> showed sustained concentration. It is not entirely
> consistent with the noted benefit from outpatient
> treatment during the relevant time period and
> ability for some significant activities of daily living
> in spite of his impairments. (Testimony; Ex. 8F; 11F;
> 14F; 3E).

Tr. 31.

Despite the ALJ's specific explanation, Guzman says that the ALJ "failed to address" evidence contrary to the opinion. Guzman then includes instances where Pron recorded Guzman's self-reported symptoms and cites to the "remainder of the treatment records from MetroHealth" and "the entirety of the psychological records from MetroHealth." Doc. 9, at 10–12, 13. But Guzman makes this assertion partly with reference to a 2007 decision that applied the since-abrogated treating physician rule.[8] Doc. 9, at 9 (citing *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th. Cir. 2007)). Unlike in 2007 when the Sixth Circuit issue *Rogers*, it is now the case that an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any [particular] medical opinion[] … including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a).

Guzman also says that the record contradicts the ALJ's determination that Nurse Pron's opinions "were not persuasive [because] they were not well-explained and were generally not supported by or consistent with the record."

---

[8]     The "treating source rule," which generally required the ALJ to defer to the opinions of treating physicians, was abrogated by 20 C.F.R. §§ 404.1520c and 416.920c for applications filed on or after March 27, 2017, like Guzman's application.

Doc. 9, at 10. Guzman is incorrect and fails to establish that substantial evidence did not support the ALJ's decision.

After reciting what he claims are the applicable standards, Guzman merely delivers Nurse Pron's opinion from the Mental Impairment Questionnaire and claims that the treatment records do support Nurse Pron's findings. Doc. 9, at 10; see Tr. 260–61. But the mere recitation of symptoms does not support a limitation. *See* 20 C.F.R. §§ 404.1529, 416.929. Guzman is correct that he reported his depressed mood, loss of motivation, hallucinations, and other symptoms to Nurse Pron. Doc. 9, at 11. But Pron and Counselor Martinez routinely also found Guzman oriented to time, person, and place, displaying normal speech patterns and logical thought processes, with calm, cooperative, and appropriate behavior, and normal memory, attention, concentration, insight, and judgment. *See, e.g.,* Tr. 677, 728, 737, 746,756, 992, 1005, 1034. Guzman omits much of those findings in his recitation of the facts and discussion of the ALJ's decision. Importantly, he omits the ALJ's focus on the fact that Nurse Pron's opinions were generally not well-explained and were inconsistent with (1) her treatment notes and exam findings, (2) the "noted benefit" Guzman received from outpatient treatment, (3) Guzman's ability to engage "some significant activities of daily living in spite of his impairments." Tr. 31.

As such, the ALJ determined that the objective medical evidence did not support Guzman's allegations or the severity of his mental impairment. Tr. 29.

In addition to the normal findings discussed above, the ALJ noted that Guzman's providers observed no indication that he was responding to internal stimuli, and, on occasion, recorded that he exhibited no evidence of paranoia, delusions, or any abnormal perception. Tr. 29. The ALJ considered the fact that Guzman's medication seemed to control his symptoms and noted that the nature of Guzman's treatment during the relevant time period—primarily talk therapy and pharmacological management—was not commensurate with the level of impairment that he alleged. Tr. 28.

Next, the ALJ highlighted the activities in which Guzman engaged that were inconsistent with his claimed degree of limitation. Tr. 30. These include living alone while his mother was away, handling his own personal care, preparing his own simple meals, and completing his own chores. *Id*. An ALJ may properly consider a claimant's daily activities when determining whether the claimant's allegations are consistent with the record. *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 195 (6th Cir. 2020). Here, the ALJ cited ample evidence to support the finding that Guzman's alleged limitations were generally not supported by, or consistent with, the evidence. *Id*.

There's more. The ALJ noted that while Guzman has required medication adjustments and continues to have functionally limiting symptoms including hallucinations, the record shows that he has had substantial improvement in the control of his symptoms. Tr. 28. She then methodically listed the dosage and medication adjustments he has received, and their

varying level of effectiveness on a steady line of improvement toward his treatment goals. Tr. 28–29. The ALJ wrote,

> Overall, the mental status exams of treating specialist providers w[ere] not strongly adverse, and not consistent with the level of limitation alleged by the claimant. Perceptions of hallucinations are noted on some exams, but there is no indication that the claimant was actually observed to be responding to internal stimuli, and many exams show no evidence of perceptual disturbance [and] no abnormal psychotic though processes.

Tr. 29. The ALJ acknowledged Guzman's "fairly long history of mental health treatment" but indicated that this doesn't suggest greater limitations during the current time period. *Id.*

The ALJ also pointed out contradictions within the statements that Guzman made. For example, the ALJ observed that despite Guzman's assertion that he could not leave the house without his mother, this limitation does not appear in the record and was inconsistent with his presence in a car with his cousin during the relevant time period. Tr. 30. The ALJ pointed out that despite Guzman's claim that he had not used marijuana for two years before the December 2020 hearing, the record reflected that as recently as three months before the hearing, his mother forced him to quit smoking marijuana. *Id.*

Whether, as Guzman claims, substantial evidence could support the conclusion that Guzman is disabled is irrelevant because Guzman failed to show that the ALJ's finding that he was *not* disabled was *not* supported by

substantial evidence. Guzman failed to show that the AJ's reasoning is flawed or otherwise unsupported by substantial evidence.

These arguments, in effect, request the Court to reweigh the evidence. But "[t]his court does not weigh evidence, assess credibility, or resolve conflicts in testimony—that's the ALJ's job." *Rottmann*, 817 F. App'x. at 196 (citing *Dyson v. Comm'r of Soc. Sec.,* 786 F. App'x 586, 588 (6th Cir. 2019)). So substantial evidence supports the ALJ's evaluation of the medical opinion evidence and Guzman hasn't shown any flaw in the ALJ's logic. And "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). Whether substantial evidence supports the conclusion that Guzman could have been found disabled is irrelevant unless he shows that substantial evidence does not support the ALJ's decision, which he failed to do. The ALJ reinforced the conclusion that Nurse Pron's opinions were not persuasive with evidence related to consistency and supportability, and Guzman fails to demonstrate how substantial evidence did not support this conclusion. Tr. 31. As such, the Court should uphold the Commissioner's decision.

> *Issue 2: The ALJ did not err when she evaluated the combined effect of Guzman's symptoms.*

It's not entirely clear what Guzman claims in his second issue. The caption to his argument indicates that his second issue is about whether the ALJ erred by not finding that "the waxing and waning" of his "symptoms

would preclude him from engaging in substantial gainful activity on a full-time and sustained basis." Doc. 9, at 15. But he doesn't back this argument up, doesn't specifically explain how the medical evidence supports the argument, and only comes back to it in the last paragraph of his second argument.[9] *Id.* at 18. So this issue is forfeited.

There appears to be another possible issue lurking in Guzman's second argument. As near as I can tell—and discerning a counseled argument shouldn't be this difficult—Guzman's possible other argument is that simply because he could perform some activities doesn't mean there is not substantial evidence that he's not disabled and that the ALJ somehow failed to appreciate the combined effects of Guzman's symptoms. Doc. 9, at 17–18. But, again, he doesn't provide any analysis to support this argument. And since he has counsel, I'm disinclined to provide the analysis for him. *Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel."). So this argument is forfeited. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a

---

[9]     Judging by the frequency with which Guzman's counsel raises this issue and the manner in which it is presented here and in other cases, it is apparent that this is an issue that Guzman has merely thrown out to see if it will stick. *E.g.*, *Lawrence v. Comm'r of Soc. Sec.*, No. 1:21-cv-01691-JG, 2023 WL 2246704, at *13 (N.D. Ohio Jan. 19, 2023), *report and recommendation adopted*, No. 1:21-cv-01691, 2023 WL 2242796 (N.D. Ohio Feb. 27, 2023); *Overstreet v. Comm'r of Soc. Sec.*, No. 1:21-cv-2062, 2022 WL 15524729, at *11 (N.D. Ohio Oct. 11, 2022), *report and recommendation adopted*, No. 1:21-cv-2062, 2022 WL 15522981 (N.D. Ohio Oct. 27, 2022).

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

*Issue 3: The ALJ did not err in her application of Social Security Ruling 16-3p*

In his final issue, Guzman claims that the ALJ failed to properly consider Guzman's self-reported limitations, and those described by his mother, in contravention of Social Security Ruling (SSR) 16-3p. SSR 16-3p provides guidance about how to evaluate subjective statements regarding the intensity, persistence, and limiting effects of symptoms, including pain, in a disability claim. It directs an ALJ to consider a claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. Social Security Ruling 16-3p Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304, *5–8 (Oct. 25, 2017).

Guzman argues that the ALJ's evaluation of his symptoms or subjective complaints was deficient and unsupported by the record. Doc. 9, at 18. Guzman also argues that the ALJ violated SSR 16-3p by failing to properly consider Guzman's statements in his function report and testimony, and claims that the ALJ's analysis lacked detail beyond a "boilerplate paragraph." Doc. 9, at 21.

Guzman's arguments are belied by the record. "[A]n ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of

disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citing *Walters v. Comm'r of Soc. Sec*, 127 F.3d 525, 531 (6th Cir. 1997)). Here, the ALJ cited sufficient evidence to support the evaluation of Guzman's subjective complaints, and thus did not commit error. Guzman's argument on this issue fails.

In finding that Guzman's claims were not consistent with the record, the ALJ concluded that his claims were: (1) inconsistent with the objective medical evidence; (2) undermined by the nature and strength of his treatment—which she found to be improving his condition; (3) incongruent with his reported daily activities and functioning; and (4) undermined by contradictory statements by Guzman. Tr. 28–30. In simply referring to the "boilerplate paragraph" in which the ALJ documents her findings, Guzman ignores the majority of the ALJ's decision and reasoning. Doc. 9, at 21 (citing Tr. 27).

To that end, Guzman also incorrectly asserts that the ALJ failed to apply the "criteria of SSR 16-3p." Doc. 9, at 22. As the Commissioner notes, Guzman's claims regarding SSR 16-3p are belied by his own arguments elsewhere in his brief. For example, when Guzman takes issue with the ALJ's finding that "since he was capable of basic activities, he was not disabled," Doc. 9, at 17, he ignores that the ALJ was discussing the SSR 16-3p criteria of daily activity and considering Guzman's capabilities thereto in her reasoning, Tr. 26. The ALJ considered Guzman's complaints (in his hearing testimony and function report), the objective medical evidence (the observations and findings of Nurse

Pron and Jane Martinez), treatment he received (medication, talk therapy notes, adjustments made), daily activities, medical opinions, and his ability to care for himself when his mother was away. Tr. 25–31. The ALJ concluded that, based on analysis of the foregoing, the consistency of Guzman's allegations was weakened by the inconsistency between his statements and the medical evidence, and that his impairments are not as intense or persistent as he claimed during his testimony at the hearing. Tr. 30, 31.

The ALJ articulated specific reasons for discounting Guzman's testimony, devoting many pages of the decision to a review of the medical records, professional opinions, and hearing testimony. Tr. 25–30. The ALJ found that Guzman had severe impairments of persistent depressive disorder with mood congruent psychotic features, early onset; paranoid schizophrenia; and generalized anxiety but that his claims concerning the intensity, persistence and limiting effects of the symptoms of his conditions were not consistent with the medical evidence and other evidence in the record, and cited the record throughout. *Id*. The record does not support Guzman's argument that the ALJ violated SSR 16-3p.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the

Commissioner's decision.

Dated: March 28, 2023

/s/ James E. Grimes Jr.
James E. Grimes Jr.
U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with
the Clerk of Court within 14 days after the party objecting has been served
with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure
to file objections within the specified time may forfeit the right to appeal the
District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th
Cir. 2019)